UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SALTY DAWG EXPEDITION, INC.,
and DAVID BOCK,

    Plaintiffs,

v.                                      CASE NO. 8:16-cv-3268-T-23TBM

KEVIN BORLAND,

    Defendant.
_____/

**ORDER**

The owner and captain of a 55-foot Nordhavn trawler (*M/V Salty Dawg*), David Bock solicited "crew" for a month-long trip from Tampa Bay to Cancún to New Orleans. In an April 25, 2016 e-mail to a Nordhavn "listserv," Bock wrote:

> Seeking Crew for our Nordhavn 55
>
> . . . .
>
> Single or couple for passage from Tampa Bay Area to Caribbean Mexico-Cancun, then to New Orleans starting 2nd week in May for about a month. Non-smoking & light drinkers. Responsibilities to share watch & cover personal expenses.

(Doc. 19-5) Trawling Nordhavn's website, Kevin Borland discovered the Nordhavn listserv and responded to Bock's e-mail. An "inexperienced" boater, Borland explained that he and Deidre Livingston (Borland's partner) were "researching and learning everything we can in anticipation of buying" a Nordhavn. (Doc. 19-4

at 163) David and his wife, Lowie, called Borland and Livingston for an "interview." (L. Bock Depo. at 10, Borland Depo. at 46) Borland purportedly asked David "what [the Bocks'] expectation of us as crew members was" (Borland Depo. at 46), and David explained that the Bocks "need [Borland and Livingston] to do night watches and maybe some minor line handling and so forth." (Borland Depo. at 46; *accord* D. Bock Depo. at 35)

After the call, the Bocks agreed that Borland and Livingston could accompany the Bocks on the voyage. (D. Bock Depo. at 26) The two couples originally intended to travel from Sarasota to Puerto Morales (a small port near Cancún), a three- or four-day voyage. (Doc. 19-4 at 165) The *Salty Dawg* would remain in Puerto Morales for two or three weeks before leaving for New Orleans, another three- or four-day voyage. (Doc. 19-4 at 165) Bock expected the *Salty Dawg* to arrive in New Orleans the first week of June. (Doc. 19-4 at 165)

On May 7, 2016, Borland and Livingston arrived in Sarasota, the *Salty Dawg*'s home port, but the threat of heavy rain and strong winds delayed the *Salty Dawg*'s departure until the morning of May 9. (Doc. 19-4 at 172) Soon after the *Salty Dawg* left port, Bock trained Borland and Livingston for the couple's first watch. (D. Bock Depo. at 35; Borland Depo. at 60) Borland describes the training as "limited," a description with which Bock appears to agree. (Borland Depo. at 60; D. Bock Depo. at 35) Bock showed Borland how to read the radar (D. Bock Depo. at 35) but offered little or no guidance how to change the vessel's speed or course. (Borland Depo.

- 2 -

at 153) Bock instructed Borland, who along with Livingston would stand watch from 8 p.m. to midnight on the first night of the voyage, to awaken Bock in an emergency. (D. Bock Depo. at 36) Borland and Livingston successfully completed the first watch and returned to their stateroom to sleep.

During the night, the *Salty Dawg* "started getting into heavy weather," and the rough seas awakened Borland around 3 a.m. (Borland Depo. at 66) Borland, who admittedly lacks any experience estimating a wave's height, believes the waves exceeded ten feet. (Borland Depo. at 75 and 145) At 6 a.m., Borland and Livingston returned to the helm for their second watch. Prone to sea sickness and wearing a scopolamine patch, Borland became nauseated around 7:30 a.m. and went below deck to the head. (Borland Depo. at 74) After a bout of sea sickness, Borland returned to his stateroom and briefly rested on a bed. (Borland Depo. at 78) Borland rose from the bed around 8 a.m. and walked toward the stairs, but the turbulent seas resulted in Borland's losing his balance and falling on his back. (Borland Depo. at 81 ("The floor just basically fell out from under me after . . . a wave")) Livingston immediately alerted Bock to Borland's fall. (D. Bock Depo. at 45)

As he lay on the deck, Borland felt an intense pain in his "mid to low back." (Borland Depo. at 85) A retired dentist, Bock "did a neurological assessment," which revealed no paralysis. (D. Bock Depo. at 46) In too much pain to walk, Borland "crawled" into bed, where he remained for the next two days. (Borland Depo. at 92) After debating whether to return to Florida, Bock decided to continue

to Mexico. (D. Bock Depo. at 47) Victoria Hospital in Cancún admitted Borland soon after the *Salty Dawg* arrived in Mexico, and a surgeon treated a fractured vertebra. According to Borland's doctor in the U.S., Borland's recovery proceeds normally. (Borland Depo. at 124)

David Bock and Salty Dawg Expedition, Inc., which owns the *Salty Dawg*, sue (Doc. 1) in admiralty and request a declaration that the plaintiffs owe Borland no maintenance and cure under the Jones Act, which provides a cause of action to "a seaman injured in the course of employment." 46 U.S.C. § 30104. Borland counterclaims (Doc. 9) under the Jones Act for negligence (count I), unseaworthiness (count II), and willful failure to provide maintenance and cure (count III). Also, Borland counterclaims for negligence under general admiralty law (count IV). Arguing that Borland qualifies neither as an employee nor as a seaman, Bock moves (Doc. 19) for summary judgment on the Jones Act claim and counterclaims.

## DISCUSSION

**1. Borland's employment relation**

Whether Bock employed Borland depends on whether Bock enjoyed the right to control Borland's work, whether Bock compensated Borland, whether Bock furnished the equipment necessary for Borland's work, and whether Bock could terminate Borland's service. *Langfitt v. Fed. Marine Terminals, Inc.*, 647 F.3d 1116, 1121 (11th Cir. 2011) (citing *Restatement (Second) of Agency* § 220 (1958)). Also, the

parties' intent to establish an employment relation can contribute to resolving Bock's employment status. *Restatement (Second) of Agency* § 220(2)(I).

First, Bock argues that his exercise of control over Borland's work insufficiently evidences an employment relation and emphasizes that Bock "did not stand over [Borland and Livingston's] shoulders directing them on how to conduct the watch." (Doc. 19 at 22) But an employment relation depends on the putative employer's right to control, not the degree of control "actual[ly] exercise[d]." *Langfitt*, 647 F.3d at 1121 (citing *NLRB v. Steinberg*, 182 F.2d 850 (5th Cir. 1950)). Bock admits his right to relieve Borland of watch duty or to instruct Borland to stop any behavior that Bock disliked. (D. Bock Depo. at 53) Also, Bock instructed Borland how to perform the watch (for example, by directing Borland to monitor the radar and to awaken Bock in an emergency). (D. Bock Depo. at 36–37 and 42; Borland Depo. at 149) Bock's right to control the performance of Borland's service aboard the *Salty Dawg* counsels strongly in favor of an employment relation.

Second, Bock offered Borland and Livingston no monetary compensation. (Borland Depo. at 44 and 104) Borland correctly responds that an employee might receive non-monetary compensation. (Doc. 20 at 16) Asked whether he "[was] actually looking for employment," Borland said "[n]o, we were looking for sea hours and [experience]." (Borland Depo. at 43) Although Borland received no monetary compensation, a reasonable jury might conclude that the experience and the lodging aboard the vessel compensated Borland. Also, a person not paid for a service can

constitute an employee. *Restatement (Second) of Agency* § 225 ("One who volunteers services without an agreement for or expectation of reward may be a servant of the one accepting such services.").

Third, Bock undisputedly "furnished" the *Salty Dawg*. Bock, who argues that he considered Borland an "at[-]will guest," correctly acknowledges the minimal importance of this factor. The owner of a vessel necessarily "furnishes" the vessel to everyone aboard, including a passenger. Fourth, the parties agree that Bock could relieve Borland of watch duty. As explained above, the right to control Borland's performance suggests an employment relation. Bock emphasizes the lack of an employment contract and a wage, but a person who serves "gratuitously" and without "promis[ing]" to serve can constitute an employee. *Restatement (Second) of Agency* § 225, Comment A ("Consideration . . . is not necessary in the case of master and servant. One may be a servant without having promised to give [service] or to continue the service.").

Fifth, Borland repeatedly declines to identify as an "employee" but instead considers himself a "crew member." (Borland Depo. at 102–03) Asked how he distinguishes an "employee" from a "crew member," Borland articulates no distinction. (Borland Depo. at 103) Borland acknowledges that the call with the Bocks involved none of the "interactions" that typically precede an employment relation (for example, the discussion of salary). (Borland Depo. at 104) Although Bock argues that he considered Borland an "at-will guest" rather than a "crew

- 6 -

member" or an "employee," in the April 25 e-mail Bock solicited applications for "crew."  (Doc. 19-5)  And Bock included Borland in a "crew list" submitted to Mexican customs.[1]  (Doc. 19-2)  Employment typically requires a shared intent to create an employment relation.  *Cf. Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1492 (10th Cir. 1995) (Cook, J.) (explaining, in an action for breach of an employment contract, that a "unilateral expectation" of employment cannot suffice and that the evidence must show a "mutual intent" to form an employment relation).  In this instance, ambiguity in the parties' characterization of their relation precludes finding as a matter of law either a shared intent or the absence of a shared intent to create an employment relation.

In sum, the evidence reveals that the Bocks invited Borland, a real estate broker interested in buying a Nordhavn, to accompany the Bocks on a month-long voyage to Mexico and New Orleans.  Although Borland signed no written employment contract and received no monetary compensation (Borland Depo. at 102–04), Borland views the "experience" and "sea hours" as compensation for serving aboard the *Salty Dawg*.  Also, a person can constitute an employee even though the employer offers no monetary compensation.  Additionally, Borland undisputedly contributed to the vessel's mission (D. Bock Depo. at 50), and Bock enjoyed the right to control Borland's performance of watch.  Viewed favorably to Borland, the record evidences a factual dispute whether Bock employed Borland.

---

[1] Bock states that he listed Borland as crew because "passengers are paying people and everybody else on the boat is crew." (D. Bock Depo. at 58)

**2. Borland's status as a seaman**

The Jones Act, which distinguishes between a "land-based" and a "sea-based maritime worker[]," provides a remedy only to a "sea-based maritime worker"—a "seaman." *McDermott Intern., Inc. v. Wilander*, 498 U.S. 337, 347–48 (1991). To qualify as a seaman, an employee must contribute to the accomplishment of the vessel's mission, that is, the employee must "do[] ship's work." *Wilander*, 498 U.S. at 355. Borland, who suffered an injury on watch, concededly contributed to the accomplishment of the *Salty Dawg*'s mission. (Doc. 19 at 14; D. Bock Depo. at 50)

Also, to qualify as a seaman the employee must "have a connection to a vessel in navigation . . . that is substantial in terms of both its duration and its nature." *Chandris, Inc. v. Latsis*, 515 U.S. 347, 368 (1995). Arguing that Borland lacks a substantial connection to the *Salty Dawg*, Bock asserts that the parties intended "not to sail the Gulf of Mexico continuously for a month, but rather to spend a substantial amount of time ashore in Mexico and New Orleans." (Doc. 19 at 15) Although the parties apparently planned several on-shore excursions (for which Borland managed a "common cash fund" (Borland Depo. at 42)), Bock submits no evidence (for example, a hotel reservation) to show that Borland would remain ashore for an extended time. The absence of evidence about Borland's intended service, if any, aboard the *Salty Dawg* while the vessel remained moored in Mexico and New Orleans precludes finding as a matter of law that the month-long voyage cannot contribute in its entirety to the determination of seaman status.

Even excluding the several weeks during the contemplated voyage that the *Salty Dawg* would remain moored or docked, the evidence shows that Borland intended to serve exclusively aboard the *Salty Dawg* for at least eight days: the three-and-a-half day voyage from Sarasota to Puerto Morales, the half-day voyage from Puerto Morales to Isla Mujeres, and the four-day voyage from Isla Mujeres to New Orleans. *Wallace v. Oceaneering International*, which *Chandris* cites with approval, explains that "[t]he requirement of a relatively permanent tie to a vessel is meant to deny seaman's status to those who come aboard a vessel for an isolated piece of work, not to deprive a person whose duties are truly navigational of Jones Act rights merely because he serves aboard a vessel for a relatively short period of time." *Wallace*, 727 F.2d 427, 434–35 (5th Cir. 1984) (Brown, J.) (internal quotation omitted). The decisions consistently exemplify the rule that a person's brief but exclusive service aboard a vessel can constitute a substantial connection to the vessel. *E.g.*, *Foulk v. Donjon Marine, Inc.,* 144 F.3d 252, 257–60 (3d Cir. 1998) (Roth, J.) (reversing summary judgment for the defendant and holding that a ten-day employment relation might establish a substantial connection to the vessel); *Wilson v. Butler*, 2009 WL 111685 at \*2–\*3 (M.D. Fla. Jan. 15, 2009) (Corrigan, J.) (denying summary judgment for the defendants and holding that a three- or four-day voyage might establish a substantial connection to the vessel); *LaCount v. Southport Enters.*, 2007 WL 1892097 at \*4–\*6 (D.N.J. June 29, 2007) (Simandle, J.) (denying summary

judgment and holding that three days of work aboard a vessel might establish a substantial connection to the vessel).

Also, a person who performs aboard a vessel less than 30% of his designated work typically lacks a substantial connection to the vessel. *Chandris*, 515 U.S. at 367. In *Palmer v. Fayard Moving & Transp. Corp*, 930 F.2d 437 (5th Cir. 1991) (Wisdom, J.), which *Chandris* cites with approval, the plaintiff completed aboard a vessel 19% of her designated duty and completed on land the remaining 81%. *Palmer* affirms the district court's conclusion that the plaintiff lacked a substantial connection to the vessel. Citing *Chandris*'s "30% requirement," Bock argues that Borland lacks a substantial connection to the *Salty Dawg* because Borland "was on watch for approximately five hours," or 20%, "of the twenty-four hours the *Salty Dawg* was actually underway."[2] (Doc. 19 at 15) But the 30% guideline measures the percentage of designated work that requires a person's presence aboard the vessel rather than the percentage of time during which the vessel's work occupies a person. For example, a mechanic who monitors a vessel's engine for six hours and rests for eighteen hours qualifies as a seaman. Although the vessel's work occupies 25% of the mechanic's time, 100% of the mechanic's designated duty involves service aboard the vessel. In this instance, 100% of Borland's contemplated duty — standing watch and handling lines — required Borland's presence aboard the *Salty Dawg*. Viewed favorably to

---

[2] As Bock acknowledges, *Chandris* bars a "'snapshot' test" that "'inspect[s] only the situation as it exists at the instant of injury.'" 515 U.S. at 363 (quoting *Easley v. Southern Shipbuilding Corp.*, 965 F.2d 1, 5 (5th Cir. 1992) (Wiener, J.)). Rather, the determination of seaman status examines the entirety of the contemplated voyage.

Borland, the record reveals a factual dispute whether Borland's relation to the *Salty Dawg* constitutes a substantial connection.

Citing *Knight v. Longaker*, 2007 WL 1864870 (N.D. Cal. June 28, 2007) (Armstrong, J.); *Hardesty v. Rossi*, 1995 WL 688416 (D. Md. Aug. 15, 1995) (Motz, J.); *Naglieri v. Bay*, 977 F.Supp. 131 (D. Conn. 1997) (Chatigny, J.), Bock argues that a "recreational" crew member lacks a substantial connection to a vessel. *Knight*, *Hardesty*, and *Naglieri* each holds that a person who participates sporadically and infrequently in one- or two-day sailing races lacks an employment relation, a substantial connection to the vessel, or both. In contrast to those decisions, a reasonable jury might conclude that the Borland's intended month-long voyage, which contemplated at least eight days of sailing during which Borland would stand watch and might handle lines, constitutes a substantial connection to the vessel. *See Boy Scouts of Am. v. Graham*, 86 F.3d 861 (9th Cir. 1996) (King, J.) (reversing summary judgment and holding that a reasonable jury might conclude that the plaintiff, who served without pay as a "mate" on a ten-day cruise, was a seaman).

### 3. "Willful" failure to pay maintenance and cure

If an employer "willful[ly]" fails to pay maintenance and cure, a seaman may recover punitive damages and an attorney's fee. *Hines v. J.A. LaPorte, Inc.*, 820 F.2d 1187 (11th Cir. 1987) (internal citations omitted). The recovery of either punitive damages or an attorney's fee requires "an element of bad faith." *Harper v. Zapata Off-Shore Co.*, 741 F.2d 87, 90 (5th Cir. 1984) (Reavley, J.). An employer's

"termination of benefits in response to the seaman's retention of counsel" or an employer's "laxness in investigating a claim" can evidence willful and bad-faith conduct. *Hines*, 820 F.2d at 1190 (quoting *Tullos v. Resources Drilling, Inc.*, 750 F.2d 380, 388 (5th Cir. 1985) (Hill, J.).

Borland alleges the conclusion that Bock "arbitrarily, willfully, wantonly, and capriciously" failed to pay maintenance and cure, but no factual allegations in the complaint suggest a willful failure. According to Borland, Bock "told me I was a Jones Act seaman in a master/slave type of relationship" (Borland Depo. at 119), and Bock acknowledges that he "might have" mentioned the Jones Act. (D. Bock Depo. at 62) Borland argues that Bock initially agreed to pay maintenance and cure but changed course after Borland decided to hire an attorney. (Doc. 20 at 18)

Despite Bock's mention of the Jones Act, the record reveals no willful and bad-faith failure to pay maintenance and cure. On the contrary, Borland's repeated decisions not to cooperate with a GEICO investigation prevented Bock's insurer, GEICO Marine, from determining the applicability of the Jones Act. In a June 1, 2016 meeting with Lucia Udlinek (an investigator hired by GEICO), Borland declined to claim seaman status. (Borland Depo. at 116, stating that, "I responded [to Udlinek] by basically rejecting everything she was trying to put forward to me"; *accord* Doc. 19-4 at 190, where Udlinek writes, "I understand that during our conversation you got uneasy about being characterized as a member of the crew of the M/V Salty Dawg") Even after Borland's apparent denial of seaman status,

Udlinek wrote Borland several more times to inquire about Borland's status.

(Doc. 19-4 at 190–193) In a June 1, 2016 e-mail, Udlinek wrote:

> I am happy to discuss this issue with you or your attorney, especially as the insurance benefits payable to a guest or a passenger under the policy are different than those payable to a crewmember. We definitely need to sort out your status before proceeding with handling your claim.
>
> I am happy to travel to Portland for a face to face meeting if you like. Just let me know.
>
> I'll be standing by to hear from you.

(Doc. 19-4 at 190) On July 5, 2016, Udlinek wrote Borland:

> We are ready and willing to process your claim. However, we are not able to proceed until you tell us whether you are making your claim as a passenger, guest[,] or member of the crew of the M/V Salty Dawg. . . When you and I spoke on June 1, you said that you would be consulting an attorney about your claim. I asked you to have him call me. To date I have not heard from anyone on your behalf.

(Doc. 19-4 at 193) Borland never responded to Udlinek's inquiries. (Borland Depo. at 120–21) On July 11, 2016, an adjustor for GEICO wrote:

> Our representative, Lucia Udlinek[,] has been in contact with you and, it is our understanding that you have advised her that you are not a Jones Act seaman. . . Additionally, you told her that you were retaining counsel with regard to your injury. To date we have not heard from any attorney and would ask that you provide us with his name and particulars.
>
> At the present time we have very little in our file and we would ask that you provide us with a short statement describing how you were injured and any other information or documents you believe are pertinent.

(Doc. 19-4 at 195) Again, Borland never responded to the July 11 letter. (Borland Depo. at 121) In sum, uncertainty about Borland's relation to the *Salty Dawg*

pervades this action. Bock's insurer repeatedly attempted to learn more about Borland's relation to the vessel and to determine the applicability of the Jones Act, but Borland demurred.[3] Even viewing the record favorably to Borland, no reasonable jury could conclude that the lack of maintenance and cure was willful.

## CONCLUSION

The motion (Doc. 19) for summary judgment is **GRANTED-IN-PART** and **DENIED-IN-PART**. Viewed favorably to Borland, the record evidences factual disputes whether Borland qualifies as an employee and as a seaman. Bock enjoyed the right to control Borland's conduct during the watch, and, although Borland neither signed an employment contract nor received monetary compensation, a jury might conclude that the "experience" and the lodging compensated Borland for crewing the *Salty Dawg*. Several decisions hold that a recreational sailor's infrequent participation in weekend sailing races fails to establish a "substantial connection" under *Chandris*. But, in this action, the parties contemplated that Borland would accompany the Bocks on a month-long trip that involved at least eight days of sailing. A dispute of material fact remains whether Borland's contemplated service aboard the *Salty Dawg* establishes a substantial connection.

After GEICO contacted Borland to inquire whether he claimed seaman status under the Jones Act, Borland stopped communicating with GEICO. Borland's

---

[3] Also, Borland's attorney e-mailed GEICO on October 7, 2016, to request maintenance. (Doc. 20-1 at 2) Less than two months later, Bock initiated this action. The prompt effort to resolve this dispute through a declaratory judgment counsels strongly against a willful and bad-faith failure to pay maintenance and cure.

- 14 -

conspicuous silence in the face of GEICO's repeated inquiries compounded uncertainty about the applicability of the Jones Act. In this circumstance, no reasonable jury could conclude that Bock willfully failed to pay maintenance and cure. The counterclaim in count III for maintenance and cure remains, but the request for an attorney's fee and punitive damages warrants denial.

ORDERED in Tampa, Florida, on June 30, 2017.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE